PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 05-1374

_____

IN RE: FRUEHAUF TRAILER CORPORATION,
                                        Debtor

PENSION TRANSFER CORP.

v.

BENEFICIARIES UNDER THE THIRD AMENDMENT
TO FRUEHAUF TRAILER
CORPORATION RETIREMENT PLAN NO. 003;
FRUEHAUF TRAILER CORPORATION RETIREMENT
PLAN, PLAN NO. 003

> Beneficiaries Under The Third
> Amendment to Fruehauf Trailer
> Corporation Retirement Plan No. 003,
> and Steven F. Hollrah and Steve Havens,
> as Class Representatives,
>
>                              Appellants

_____

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 99-cv-00115)
District Judge: Honorable Joseph J. Farnan, Jr.

————————————

Argued January 9, 2006

Before: BARRY and AMBRO, <u>Circuit Judges</u>,
and DEBEVOISE, <u>District Judge</u>[*]

(Opinion filed April 12, 2006)

Edward M. McNally, Esquire (Argued)
Morris, James, Hitchens & Williams
222 Delaware Avenue
P.O. Box 2306, 10th Floor
Wilmington, DE  19801

　　　　Counsel for Appellant

James W. Perkins, Esquire (Argued)
Greenberg Traurig
200 Park Avenue
MetLife Building
New York, NY  10166

　　　　Counsel for Appellee

————————————

[*] Honorable Dickinson R. Debevoise, Senior District
Court Judge for the District of New Jersey, sitting by
designation.

2

———————————

## OPINION OF THE COURT

———————————

AMBRO, Circuit Judge

In this appeal we consider again the meaning and scope of the Bankruptcy Code's fraudulent transfer provisions in 11 U.S.C. § 548(a)(1).  In particular, we review the District Court's determinations that: (1) a debtor's right to a surplus generated by a pension plan is a property interest; (2) an amendment to that pension plan that irrevocably decreases the surplus is a transfer of the property interest; and (3) the value surrendered and the value gained as a result of the transfer need not be precisely calculated in this instance in order to conclude that they are not reasonably equivalent.  We also review the District Court's assignment of the burden of proof.  For the reasons that follow, we affirm.

## I.  **Facts and Procedural Background**

### A.      **Fruehauf's Financial Problems**

Fruehauf Trailer Corporation ("Fruehauf" or the "Company"), a Delaware corporation, operated facilities throughout the United States that designed, manufactured, sold, distributed, and serviced truck trailers and related parts. Fruehauf expanded its business rapidly in the 1980s, leading to

3

overextension of capital and related cash flow problems. By the early 1990s Fruehauf's long-term liabilities (such as employee health care and pensions) exceeded revenues, and by 1996 Fruehauf had a negative net worth of approximately $120 million. The Company sought to address this problem by reducing its work force to approximately 2,000 employees (about half of them union members), closing facilities, and selling assets. It also froze the calculation of retirement benefits for all employees at 1991 salary levels.

In the early 1990s the Fruehauf Board of Directors (the "Board") began exploring a possible sale of the Company, in whole or in part. In 1995 Fruehauf entered into contracts with several of its top executives that would pay them significant benefits if the Company or its assets were sold. These contracts sought to ensure that top executives would remain with the Company until the sale, as the benefits would not accrue to the beneficiaries unless they were still employed by Fruehauf at that time. In 1996, Fruehauf also instituted a Key Employee Retention Program ("KERP") under which it agreed to pay bonuses totaling $1.3 million to forty key employees if they agreed to remain until the sale or March 31, 1997, whichever came first.

**B.    The Emergency Board Meeting**

Fruehauf continued to have financial difficulties, and on September 19, 1996, with the Company lacking sufficient cash to meet its payroll and other operating expenses, its Board held

4

an emergency meeting. Although the parties dispute what was considered at this meeting, the District Court concluded that the Board and Fruehauf's outside counsel discussed three things. First, they considered the possibility of a Chapter 11 bankruptcy filing. Second, they discussed a modified retention plan that would distribute immediate cash payments to twelve of the KERP beneficiaries if they agreed to remain with the Company until at least March 1, 1997 (the "KERP modification"). Finally, they discussed an amendment (known as the "Third Amendment") to the Company's pension plan.[1]

The Third Amendment was drafted by Fruehauf's outside counsel and reviewed by Geraldine Tigner (Fruehauf's Vice President of Human Resources) and Greg Fehr (a senior Fruehauf executive), both of whom were members of the Company's Pension Administration Committee. Limited to 400 Fruehauf employees (almost all of them managers or executives, and none union members or non-salaried workers), it provided two things. First, it lifted the 1991 benefit freeze for those employees who were vested in the pension plan and calculated benefits based on 1996 salaries (hereafter the "Pension Thaw Provision"). Second, it granted all covered employees a cash contribution to their pension account equal to 5% of annual salary plus 8% annual interest (hereafter the "Cash Benefit

---

[1]    The pension plan is a qualified plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 et seq. It is a nominal party to this appeal.

Provision") if they were employed by the Company or its successor on, or were laid off prior to, March 31, 1997. Because the Cash Benefit Provision was available to all employees covered by the Third Amendment, it included even those not vested in the pension plan. Notably, Tigner and Fehr, who were the only Fruehauf executives to review the Third Amendment and who were also beneficiaries of the KERP, stood to reap substantial benefits from its adoption. Fehr's pension benefits increased by 470%, while Tigner's benefits increased by 200%.[2] Fruehauf later calculated the cost of the Third Amendment as $2.4 million.

The source of funding for the Third Amendment was a surplus on the "union side" of Fruehauf's pension plan, i.e., the funds designated to pay benefits for union members exceeded the cost of those benefits. Those surplus funds would otherwise revert to the Company after benefits were paid.

With this backdrop, the Board approved the Third Amendment at the September 19, 1996 emergency meeting. It became effective on October 4, 1996.

---

[2]    The other members of the Pension Administration Committee also realized substantial gains. The pension plan's actuary testified that Kenneth Minor received a 455% increase in benefits and Joseph Damiano received a 330% increase. Derek Nagle, the CEO of Fruehauf shortly before the Company went into Chapter 11, received an increase of nearly 200%.

6

## C.    Proceedings in the Bankruptcy Court

On October 7, 1996 Fruehauf filed for Chapter 11 bankruptcy protection in the District of Delaware. Fruehauf's debts and liabilities totaled over $12 billion at this time, and it was liquidated to satisfy its creditors. Several purchasers bought Fruehauf's assets in the United States and Europe. The most significant purchaser was Wabash National, L.P. ("Wabash"), which bought two manufacturing plants and 31 distribution centers in the United States for $55 million. Although the asset purchase agreement between Fruehauf and Wabash did not contain a commitment on Wabash's part to retain any of Fruehauf's employees after the sale, it did rehire approximately 475 unionized employees. Fruehauf's remaining assets were placed in a liquidation trust (known as the "End of the Road Trust"), and the pension plan was taken over by appellee Pension Transfer Corporation ("PTC"), a subsidiary of the Trust.

During the course of the bankruptcy case, Fruehauf sought and received the Bankruptcy Court's approval of payments to key employees who had participated in the KERP. It did not seek Bankruptcy Court approval of disbursements under the Third Amendment.

On January 20, 1998, Fruehauf (as debtor-in-possession) began an adversary proceeding in the Bankruptcy Court against the pension plan, alleging that payouts under the Third Amendment would result in a fraudulent transfer in violation of

7

11 U.S.C. § 548.  The Bankruptcy Court granted Fruehauf's request for a preliminary injunction against the pension plan and enjoined the plan from distributing payments under the Third Amendment.  On October 27, 1999 the Bankruptcy Court approved Fruehauf's amended reorganization plan and substituted PTC as the administrator of the pension plan.  PTC thus replaced Fruehauf in the adversary action, which was transferred to the District Court.

### D.    Proceedings in the District Court

On April 3, 2001, the District Court granted PTC's motion to reclassify the pension plan as a nominal defendant and add the individual beneficiaries of the Third Amendment as defendants.  On May 1, 2002, the Court certified a mandatory defendant class, pursuant to Federal Rule of Civil Procedure 23, consisting of all beneficiaries of the Third Amendment (the "Class Defendants").  The Court held a three-day bench trial in March 2004.

### 1.    Testimony

At trial, PTC called three witnesses to testify: Chriss Street, an independent director of Fruehauf and trustee of the End of the Road Trust; Lawrence Wattenberg, the actuary for the Fruehauf pension plan; and Irving Becker, the head of the Compensation Advisory Services Group of the accounting firm KPMG, who testified as an expert on employment compensation in general and KERPs in particular.

8

Street testified that he and Worth Frederick, the other independent director on the Fruehauf Board, strenuously objected to the KERP modification at the September 19, 1996 meeting because it prepaid the KERP bonuses of many top executives at a time when it was difficult for those executives to find work elsewhere in the industry (resulting in little concern they would leave the Company). He also testified that the Board was not given any substantive information about the Third Amendment and that it was presented at the Board meeting as an "administrative change" that would have no cash effect on the Company. Moreover, Street testified that the Third Amendment was never presented as a part of the KERP or for the purpose of employee retention. Although Street and Frederick abstained, the Board approved both the KERP modification and the Third Amendment. Later, Street and Frederick objected to the minutes of the meeting, which stated that the Third Amendment was part of the KERP and that both of them had voted in favor. The minutes were only corrected after the Company entered Chapter 11 and Street and Frederick became the sole remaining Board members.

Wattenberg testified that his review of the Third Amendment revealed that, on average, it nearly doubled the pension benefits of non-union salaried employees, and that "[c]ertain senior executives increased their benefits by 400 to 500 percent." He also calculated that, as of September 2003, the cost of the Third Amendment rose to over $4.4 million. On cross-examination, however, he admitted that he did not calculate how much of a surplus existed in September 1996 or

9

how much money Fruehauf might have recovered without the Third Amendment.

Becker testified that the Third Amendment was not part of the KERP or otherwise for the purpose of employee retention. He noted that, in his experience, he had never seen pension benefits used as part of a KERP, and that the "reasonable norm" for KERPs would include payments to key employees of between 0.4% and 0.5% of revenue to retain them for twelve to eighteen months. He calculated that the Fruehauf KERP (apart from the Third Amendment) was at the "high end of those norms" because it paid about 0.3% of revenue to retain key employees for only eight months. If the Third Amendment was viewed as part of an employee retention plan, however, Fruehauf's plan (the KERP plus the Third Amendment) would cost 0.88% of annual revenue — which, in Becker's expert opinion, was "not reasonable and did not provide additional value to Fruehauf."

The Class Defendants called two witnesses to testify: Geraldine Tigner (as noted above, Fruehauf's Vice President of Human Resources and one of the Fruehauf executives to review and benefit from the Third Amendment) and Mark Holden, Wabash's Chief Financial Officer. Tigner testified that the Pension Thaw Provision of the Third Amendment was designed to improve morale and the Cash Benefit Provision was intended to benefit those who were not yet vested in the pension plan and thus could not benefit from the Pension Thaw Provision. She testified that both provisions were meant to help retain personnel

10

while Fruehauf was searching for a buyer, and that this understanding was communicated in an October 9, 1996 letter she sent to Fruehauf's salaried employees, which stated that the Third Amendment was intended to "reward our loyal employees whose dedication will provide the basis for a successful transition."

On cross-examination, however, Tigner conceded that the Pension Thaw Provision was intended to bring the pension plan up to date and take into account salaried employees' past service. She further testified that the Third Amendment was not made applicable to unionized employees because their collective bargaining agreements prohibited unilateral changes in benefits. She did not, however, ask the unions if their members wanted a pension increase despite the fact that the surplus used to pay for the Third Amendment had been generated on the union side of the pension plan.

Holden testified that Wabash was interested in purchasing Fruehauf "as an ongoing business" and was "very concerned about the flight risk of Management within those businesses as well as the people underneath Management." He further testified, however, that he was "not sure [Wabash] paid more money" for Fruehauf because it was an ongoing business, and agreed with plaintiff's counsel's characterization of the asset purchase agreement as assigning no value to Fruehauf's employees. Holden also stated that Wabash expressly refused to make any promises to hire any of Fruehauf's employees.

11

## 2.    District Court's Decision

On January 7, 2005, the District Court issued a comprehensive opinion finding that the Third Amendment was a fraudulent transfer under 11 U.S.C. § 548. The Court determined, as a factual matter, that the Amendment was never presented to the Board as part of the KERP, and even if it had been, the total KERP would have constituted 0.88% of annual revenue, which would have "exceeded the amount that a reasonable Company in Fruehauf's position would spend to retain employees." The Court also found the Class Defendants "offered no evidence that Wabash paid more money because the assets it purchased were ongoing operations."

Turning to the legal question of whether the Third Amendment was a fraudulent transfer, the District Court analyzed the factors set forth in § 548. It concluded that Fruehauf had a future ownership interest in any surplus generated by the pension plan, and that the Third Amendment irrevocably transferred this interest to the Class Defendants by allocating a portion of the surplus to increased pension benefits for non-union salaried employees. The Court agreed with the Class Defendants that PTC failed to prove that Fruehauf received no value from this transfer, but nonetheless concluded that the value was not "reasonably equivalent" to the costs of the transfer. Specifically, the Court rejected the Class Defendants' contention that the Third Amendment helped retain key personnel and assure that Fruehauf remained an ongoing business so that it was easier to sell. It concluded that "Fruehauf

12

received considerably less than the cost of the Third Amendment" because, coupled with the KERP, the Class Defendants' purported retention goals cost Fruehauf "twice the norm" and the Class Defendants failed to rebut adequately PTC's evidence that the $2.4 million projected cost of the Third Amendment did not help assure the $55 million Wabash purchase. Indeed, the Court noted that Holden "did not testify with certainty that Wabash would not have purchased the Fruehauf assets if they were not ongoing concerns," and Tigner "was not able to offer factual support for the conclusion that the Third Amendment had the effect of retaining Fruehauf employees." The District Court therefore determined that payments under the Third Amendment would be a fraudulent transfer that PTC could avoid.

### E.    Appeal

The Class Defendants raise three issues on appeal. First, they contend that the District Court erred in determining that PTC had a cognizable property interest in the pension plan surplus that was transferred as a result of the Third Amendment. Second, they argue that the Court erred in not applying the correct test for determining whether a transfer is fraudulent, and that error is not harmless because PTC did not satisfy its burden of proving the value surrendered and received. Third, they

13

assert that the Court erred in assigning the burden of proof.[3]

## II.  **Standard of Review**

In considering final orders of courts in bankruptcy cases, we review findings of fact for clear error and exercise plenary review over questions of law.  In re Schick, 418 F.3d 321, 323 (3d Cir. 2005).  Factual findings may only be overturned if they are "completely devoid of a credible evidentiary basis or bear[] no rational relationship to the supporting data."  Citicorp Venture Capital, Ltd. v. Comm. of Creditors, 323 F.3d 228, 232 (3d Cir. 2003) (citation and internal quotation marks omitted; alteration in original).  The District Court's allocation of the burden of proof is a question of law subject to plenary review. Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 750 (3d Cir. 1994).

## III.  **Analysis**

Section 548(a)(1) allows a trustee to avoid any transfer of the debtor's interest in property made within one year before the filing of a bankruptcy petition if the transfer was the result

---

[3] The District Court had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334, as it is an adversary proceeding arising under Title 11 of the United States Code, and we have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

14

of actual or constructive fraud.[4]  This provision "aims to make

---

[4]    At the time Fruehauf instituted the adversary proceeding at issue in this case, 11 U.S.C. § 548(a)(1) provided:

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

> (A)    made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

> (B)    (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

> (ii)    (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

> (II) was engaged in business or a transaction, or was about to engage

15

available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away." In re PWS Holding Corp., 303 F.3d 308, 313 (3d Cir. 2002).

"Actual" fraud is prohibited by § 548(a)(1)(A), which allows a trustee to avoid a transfer made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or

---

> in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

On April 20, 2005, Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, 119 Stat. 23, which amended § 548, inter alia, to allow avoidance of fraudulent transfers made within two years of the filing of a bankruptcy petition and to strengthen prohibitions on insider employment contracts not made in the ordinary course of business. See BAPCPA § 1402, 119 Stat. at 214. Because these provisions are not applicable to cases begun before the passage of the BAPCPA, see id. § 1406(b), 119 Stat. at 215-16, they are not relevant to this appeal.

16

became . . . indebted." "Constructive" fraud, the subject of this appeal, is prohibited by § 548(a)(1)(B); although it contains no intent requirement, fraud on the creditors is presumed once the plaintiff establishes the requisite elements. Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 645 (3d Cir. 1991) (hereafter "Metro Communications"). Those elements are: (1) the debtor had an interest in property; (2) a transfer of that interest occurred within one year of the bankruptcy filing; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; and (4) the transfer resulted in no value for the debtor or the value received was not "reasonably equivalent" to the value of the relinquished property interest. See 11 U.S.C. § 548(a)(1); BFP v. Resolution Trust Corp., 511 U.S. 531, 535 (1994). The party bringing the fraudulent conveyance action bears the burden of proving each of these elements by a preponderance of the evidence. See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.), 92 F.3d 139, 144 (3d Cir. 1996) (hereafter "R.M.L."). There is no dispute here that the alleged transfer was made within one year of the filing of Fruehauf's bankruptcy petition and that Fruehauf was insolvent at that time. Therefore, the relevant issues are whether PTC satisfied its burden of proving that Fruehauf had a property interest, that the interest was transferred, and that the gains and losses as a result of the transfer were not of reasonably equivalent value.

**A.  Property Interest**

The Bankruptcy Code defines property interests broadly,

17

encompassing "all legal or equitable interests of the debtor in property." 11 U.S.C. § 541(a)(1). The Supreme Court has noted that "[t]he main thrust of [the Bankruptcy Code] is to secure for creditors everything of value the bankrupt may possess in alienable or leviable form when he files his petition. To this end the term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." Segal v. Rochelle, 382 U.S. 375, 379 (1966). Property of the estate "'includes all interests, such as . . . contingent interests and future interests, whether or not transferable by the debtor.'" In re Prudential Lines, Inc., 928 F.2d 565, 572 (2d Cir. 1991) (quoting H.R. Rep. No. 95-595, 175-76 (1978)). It is also well established that "the mere 'opportunity' to receive an economic benefit in the future" is property with value under the Bankruptcy Code. R.M.L., 92 F.3d at 148.

Under ERISA, an employer who sponsors a qualifying retirement plan is entitled to recoup any surplus upon termination of the plan. See 29 U.S.C. § 1344(d)(1); Ashenbaugh v. Crucible, Inc., 1975 Salaried Retirement Plan, 854 F.2d 1516, 1523 n.9 (3d Cir. 1988). This recoupment right is a transferable property interest. See, e.g., Creasy v. Coleman Furniture Corp., 763 F.2d 656, 662 (4th Cir. 1985) ("[U]nder the terms of the contract any left-over assets of the [pension] fund were to be paid over to the Company. . . . [T]he excess, if any, would be property of the debtor's estate. The trustee acquires the rights that the corporate bankrupt possessed; therefore, the excess funds would be an asset in the bankrupt's estate."); In re

18

Wingspread Corp., 155 B.R. 658, 664 (Bankr. S.D.N.Y. 1993) ("[A]lthough the right to recover [the surplus from an ERISA-qualified retirement plan] is a future estate, the reversion itself is a present, vested estate.  As a result, the employer's reversionary interest falls within the broad reach of section 541(a) of the Bankruptcy Code and is considered property of the debtor's estate.  Not only does the employer have a present interest in those reversionary assets, but that reversionary interest is transferable and alienable." (internal citations omitted)).  In this context, the District Court was correct that Fruehauf's potential future recoupment of the surplus from its pension plan was a transferable property interest for purposes of § 548.

**B.      Transfer**

The District Court also correctly found that a property interest under the Third Amendment was transferred.  The Bankruptcy Code defines "transfer" in the broadest possible terms: "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property."  11 U.S.C. § 101(54)(D).  Under ERISA's "anti-cutback" provision, benefits accrued in a qualified plan are irrevocable; an administrator or sponsor may not decrease them once they are granted.  See 29 U.S.C. § 1054(g)(1); Central Laborers' Pension Fund v. Heinz, 541 U.S. 739, 743-44 (2004); see also Hoover v. Cumberland, Md. Area Teamsters Pension Fund, 756 F.2d 977, 981 (3d Cir. 1985) (defining "accrued benefit" as "'an annual benefit commencing

19

at normal retirement age'" (quoting 29 U.S.C. § 1002(23)(A))). There is no question here that, upon ratification of the Third Amendment by the Board, the benefits of the Pension Thaw and Cash Benefit Provisions "accrued" to the Class Defendants. Because ERISA prohibited Fruehauf from decreasing or revoking those benefits, the District Court correctly concluded that the irrevocable allocation of part of the Company's future interest in the pension plan's surplus in the form of increased benefits was a "transfer" for purposes of the Bankruptcy Code.

## C.    Reasonably Equivalent Value

The Class Defendants concentrate most of their attention on the District Court's determination that the value gained by Fruehauf from the Third Amendment was not "reasonably equivalent" to the value surrendered. Specifically, they contend that the District Court erred in finding that PTC satisfied its burden of proof even though it did not conclusively establish either the value that Fruehauf gave up as a result of its commitment to fund the Third Amendment or the value that Fruehauf gained. This, the Class Defendants assert, runs afoul of <u>Metro Communications</u>' calculation requirement.

### 1.    Value

Before considering a plaintiff's obligation to define with precision the value surrendered and gained as a result of a transfer, we need to understand the general structure of the reasonably equivalent value analysis. We have interpreted

"value" to include "any benefit[,] . . . whether direct or indirect."
R.M.L., 92 F.3d at 150.   As noted above, "the mere
'opportunity' to receive an economic benefit in the future
constitutes 'value' under the [Bankruptcy] Code." Id. at 148.
Thus, Fruehauf gave up something of value when the Board
ratified the Third Amendment.

The next question is whether the debtor received any
value from the transfer.  See id. at 149-50.  Although, as
explained below, the "totality of the circumstances" is
considered in determining whether the values surrendered and
gained as a result of a transfer are reasonably equivalent, a court
should not consider the "totality of the circumstances" in
evaluating the threshold question of whether any value was
received at all.  Id. at 150.  Rather, a court must consider
whether, "based on the circumstances that existed at the time"
of the transfer, it was "legitimate and reasonable" to expect
some value accruing to the debtor. Id. at 152 (internal quotation
marks and emphasis omitted).  Although PTC argued before the
District Court that the Third Amendment did not confer any
value on Fruehauf, the Court disagreed because PTC had not
excluded the possibility that "the Third Amendment [was]
effective in retaining the services of at least one Fruehauf
employee."   PTC does not challenge this determination on
appeal.

If a court determines that the debtor gained at least some
value as a result of the transfer, what follows is a comparison:
whether the debtor got roughly the value it gave. See 11 U.S.C.

21

§ 548(a)(1)(A); <u>Metro Commc'ns</u>, 945 F.2d at 647.  In conducting this factual analysis, a court does look to the "totality of the circumstances," including (1) the "fair market value" of the benefit received as a result of the transfer, (2) "the existence of an arm's-length relationship between the debtor and the transferee," and (3) the transferee's good faith.  <u>R.M.L.</u>, 92 F.3d at 148-49, 153.

### 2.    Calculation Requirements

As noted above, "[t]he value of consideration received must be compared to the value given by the debtor."  <u>Metro Commc'ns</u>, 945 F.2d at 648.  Calculating "direct" benefits (such as an investment of cash that yields a cash return) is typically easy, but becomes more difficult when benefits are "indirect."  <u>See</u> <u>R.M.L.</u>, 92 F.3d at 148.  Nonetheless, "[t]hese indirect economic benefits must be measured and then compared to the obligations that the bankrupt incurred."  <u>Metro Commc'ns</u>, 945 F.2d at 647; <u>see</u> <u>In re Richards & Conover Steel Co.</u>, 267 B.R. 602, 612 (B.A.P. 8th Cir. 2001) ("[I]n deciding whether value has been transferred the court must examine all aspects of the transaction and carefully measure the value of all benefits and burdens to the debtor, direct or indirect." (citation and internal quotation marks omitted)); <u>In re BCP Mgmt., Inc.</u>, 320 B.R. 265, 280 (Bankr. D. Del. 2005) (same, citing <u>Metro Communications</u>).

<u>Metro Communications</u> does not, however, require a precise calculation of value in all circumstances.  There, Mellon

22

Bank ("Mellon") provided Total Communications Systems ("TCS") with a $1.85 million loan to acquire Metro Communications, Inc. ("Metro"). Metro guaranteed TCS's debt to Mellon and, to secure that guaranty, it granted Mellon a security interest in its assets. As a result of this transfer, Metro (as part of TCS) was eligible for substantial advances of credit and had the opportunity to "synergize" its operations with those of TCS. Yet Metro went bankrupt shortly thereafter, and the unsecured creditors' committee argued that the security interest conferred no value on Metro because "Metro did not receive the proceeds of the acquisition loan, [and thus] did not receive any direct benefits from extending the guaranty and security interest collaterizing that guaranty." Metro Commc'ns, 945 F.2d at 646. In holding that the security interest was not a fraudulent transfer under § 548, we noted:

> The value . . . of the synergy obtained in the corporations' affiliation and the value of obtaining the credit are difficult to quantify in dollars without the aid of expert witnesses. Regrettably, no such testimony was forthcoming in this case. . . .
>
> We do know that the assets of the guaranteeing corporations were sufficiently valuable to justify an immediate additional loan by Mellon to TCS of 2.3 million dollars and letters of credit for an additional 2.25 million dollars. These loans enabled Metro . . .

23

immediately to achieve a very sharp rise in its
broadcasting rights amounting to a grand total of
$26,240,705.  Although the ability to obtain credit
is the lifeblood of the commercial world and
governmental operational survival, and the
synergistic strength expected from the merger
here, no doubt had value, the Committee
introduced no evidence to support its burden of
showing that Metro received less than reasonably
equivalent value in exchange for its guaranty and
security interest.  The Committee acted on the
blind assumption that they had no value . . . .

Id. at 647-48.

Our decision in R.M.L. clarified Metro Communications'
requirements.  The R.M.L. debtor paid $390,000 in commitment
fees to Mellon Bank for the chance to secure a loan of $53
million, but the loan was never made.  Moreover, the agreement
between the debtor and Mellon Bank provided that the
commitment fees would be retained by Mellon "even if the loan
did not close."  R.M.L., 92 F.3d at 143.  In determining whether
the commitment fees were a fraudulent transfer, we reiterated
that "essential to a proper application of the totality of the
circumstances test [in determining reasonably equivalent value]
is a comparison between the value that was conferred and the
fees [the debtor] paid."  Id. at 154.  We "acknowledge[d] that
the measurement and comparison called for by [Metro
Communications] is no easy task," but "expressed no

24

reservations about the bankruptcy courts' ability to analyze such potential, intangible benefits." Id. And yet, despite the Bankruptcy Court not calculating the actual value of the benefits that accrued to the debtor as a result of paying the commitment fees, we discerned no clear error in the Bankruptcy Court's determination that "the chances of the loan closing were negligible," and thus "whatever value was conferred" by the chance of securing the loan was "minimal" and "not reasonably equivalent to the fees [the debtor] paid." Id. at 148, 153-54; see also In re Int'l Mgmt. Assocs., 399 F.3d 1288, 1292 (11th Cir. 2005) (assuming, despite the lack of precise calculations in the record, that the value of stock received as a result of a transfer was obviously "less than [the] $100,000 [cost of the transfer] and in all probability was worthless").

R.M.L. clarifies that Metro Communications did not establish a per se rule requiring a precise calculation of the cash value of intangible costs and benefits in every case, nor did it preclude all inferences regarding values surrendered and gained as a result of a transfer. Rather, we believe Metro Communications, in light of our subsequent holding in R.M.L., stands for two principles. First, in those cases where the plaintiff contends that a transfer resulted in no value to the debtor, the plaintiff must ordinarily prove that the calculated value of the benefit is zero. If no calculations are offered into evidence, and there is some evidence that the benefit conferred

25

value, the plaintiff cannot satisfy its burden of proof.[5]  Second, where the value of an intangible benefit <u>could</u> equal or exceed the value surrendered by the debtor, precise calculations are essential to allow the court to determine equivalency properly.

But this general rule yields to common sense: in those cases where a court has sufficient evidence to conclude, based on a totality of the circumstances, that the benefits to the debtor are minimal and certainly not equivalent to the value of a substantial outlay of assets, the plaintiff need not prove the precise value of the benefit because such a calculation is unnecessary to the court's analysis.  Moreover, <u>R.M.L.</u> makes clear that the trier of fact's ultimate determination of whether the values are reasonably equivalent is reviewed only for clear error, even if the court did not convert those values into precise cash quantities.

### 3.    Application to this Case

We therefore determine whether PTC failed to calculate the cash costs to Fruehauf of the Third Amendment and the cash value of the benefits to Fruehauf, and, if so, whether the District Court's determination that these values were not "reasonably equivalent" is clearly erroneous.  We conclude that the District

---

[5]  Such a rule comports with our observation in <u>R.M.L.</u> that it will be a "rare occasion[]" when "a debtor exchanges cash for intangibles that have no 'value' at the time of the transfer." 92 F.3d at 149 n.3.

Court committed no error, let alone clear error.

The Class Defendants contend, first, that the District Court erred in ruling that PTC satisfied its burden of proving what Fruehauf would have had to pay to fund the Third Amendment. The Court found, based on Fruehauf's own calculation, that the projected cost of the Third Amendment was $2.4 million. At oral argument before us, the Class Defendants contended that the actual cost of the Amendment was less because the projected cost did not take into account variables such as changes in retirement age and shortened duration of the plan.

We conclude, however, that the District Court did not clearly err in relying on Fruehauf's own calculation of the cost of the Third Amendment. For the reasons stated in Part III.D below, PTC did not need to disprove the Class Defendants' assertions that Fruehauf's calculations were inaccurate. Rather, the Class Defendants should have come forward with evidence that the cost of the plan had changed, and they did not. Moreover, we note that the pension plan actuary (Wattenberg) testified that, based on revised calculations in September 2003, the cost of the Third Amendment actually rose to over $4.4 million. In this context, the District Court had ample evidence to conclude that the cost to Fruehauf of funding the Third Amendment was at least $2.4 million, and since the Class Defendants did not provide evidence of a different amount, the Court's finding was not clearly erroneous.

The District Court found that Fruehauf accrued some benefit as a result of the Third Amendment, but did not place a dollar figure on that amount. It did find, however, that whatever the value was, it was "considerably less than the cost of the Third Amendment." The Class Defendants contend this was error because, as the District Court stated, PTC did not sustain its burden of proving that the Third Amendment had no usefulness as an employee retention mechanism. Therefore, insofar as the Third Amendment helped Fruehauf retain key employees and maintain an ongoing business while the Company was looking for a buyer, the Class Defendants contend it was not a fraudulent transfer because it helped secure Wabash's eventual purchase of Fruehauf's ongoing business operations for $55 million. This, in the Class Defendants' view, is easily "equivalent" to the projected $2.4 million cost of the Third Amendment.

The District Court held that the Third Amendment conferred some value on Fruehauf because it "may have been effective in retaining the services of at least one Fruehauf employee." Nonetheless, the Court went on to conclude that the Third Amendment was never presented to the Board or the Bankruptcy Court as part of Fruehauf's employee retention program, and even if it were part of that program, the combined cost of the Third Amendment and the KERP was "twice the norm" of employee retention plans in other companies and "exceeded the amount necessary to retain employees."

The Court also found that "the manner in which the Third

28

Amendment was presented to Fruehauf's Board of Directors for approval, and the fact that the Third Amendment's sponsors stood to benefit significantly from its implementation," strongly weighed in favor of finding that the Amendment did not confer reasonably equivalent value on Fruehauf.  Though the District Court did not expressly refer to the totality of the circumstances test approved in R.M.L., its analysis closely tracks that test. Even if we accept the Class Defendants' assertion that the Third Amendment was intended to retain employees, the fact that it and the KERP cost twice what an employee retention plan normally costs, in an industry with very few other jobs to which employees might go, tends to prove that Fruehauf did not pay fair market value for the benefit received.  That the benefits inured substantially to corporate insiders, and the Amendment was reviewed by those who stood to gain between 200% and 500% increases in their pension benefits if it were approved, suggest that the transaction was not conducted at arm's length. Moreover, funding the Third Amendment from the union-side pension plan surplus — without informing the unions or even raising with them the possibility of pension increases for their members (and therefore not benefitting those union employees) — coupled with the fact that the Third Amendment was presented to the Board, inaccurately, as an "administrative formality" that required no discussion nor a cash expenditure from Fruehauf, strongly suggest that the Third Amendment was not a "good faith" transaction.

Since the totality of the circumstances, based on record evidence, supports a finding that the value gained was not

29

reasonably equivalent to the value lost (and therefore the finding is not clearly erroneous), did the District Court nonetheless err because the plaintiff did not prove the precise cash value of the benefit received?  The answer in this case is plainly no.  As explained above, our cases establish no rule so particular; indeed, such formalism would be at odds with § 548, which merely requires that the plaintiff prove, by a preponderance of the evidence, that the value surrendered in the transfer was not reasonably equivalent to the value gained from the transfer.  The District Court correctly found that although PTC did not prove that the Third Amendment conferred <u>no</u> value on Fruehauf, the value the Amendment <u>did</u> confer was largely redundant of the value conferred by the KERP and, based on the totality of the circumstances, the Third Amendment as an employee retention device was overpriced, not negotiated at arm's length, accrued substantially to the benefit of corporate insiders, and was not implemented in good faith.

The conclusion from these findings is that, while the Third Amendment might have conferred some value on Fruehauf by influencing at least one employee to stay with the Company, it was not, on the whole, useful as an independent means of maintaining Fruehauf as an ongoing business prior to sale.  Therefore, this case is not, as the Class Defendants contend in their brief, one where Fruehauf invested $2.4 million in its pension plan to maintain an ongoing business and safeguard a $55 million sale.  As in <u>R.M.L.</u>, PTC's failure to present evidence of the precise cash value of the minimal benefit that did accrue to Fruehauf as a result of the Third Amendment

30

is of no consequence.

### D.    Burden of Proof

The Class Defendants also contend that the District Court inappropriately assigned them the burden of proving that the values surrendered and gained as a result of the Third Amendment were reasonably equivalent. In particular, they cite the District Court's observations that Tigner "was not able to offer factual support for the conclusion that the Third Amendment had the effect of retaining Fruehauf employees," and that, even if she had offered that support, Wabash CFO Holden "did not testify with certainty that Wabash would not have purchased the Fruehauf assets if they were not ongoing concerns." These statements by the Court, the Class Defendants argue, misplace what should be PTC's burden of proof.

This argument is not convincing.  The District Court stated several times that PTC had the burden of proof and the Class Defendants bore no burden, and we therefore doubt that the Court was confused on the proper allocation of the burden of proof.  In any event, PTC offered testimony and other evidence that the Third Amendment was not a component of the employee retention plan.  Even if it were, Wabash did not assign added value to Fruehauf as an ongoing business nor did Wabash value the existence of a continuing workforce (and indeed took steps to assure that Fruehauf's employees would be terminated before the sale took place so that Wabash could hire workers as it saw fit).  The Class Defendants argued the opposite: that the

31

Third Amendment was intended to retain employees and maintain an ongoing business and that Wabash paid extra for Fruehauf because the latter was an ongoing business. The Class Defendants did not, however, present evidence in support of their contentions sufficient to convince the District Court that PTC had not met its burden of proof. As the First Circuit Court of Appeals has noted:

> The Trustee undisputably has the burden of proving the transfers were fraudulent, and this burden never shifts to [the defendant]. But [a] court [should not] equate the burden of proof with the burden of production.
>
> > The burden of the issue and the duty of going forward with evidence are two very different things. The former remains on the party affirming a fact in support of his case, and does not change at any time throughout the trial. The latter may shift from side to side as the case progresses, according to the nature and strength of the proofs offered in support or denial of the main fact to be established.
>
> 9 Wigmore, Evidence § 2487 (Chadbourn rev.1981). . . . Once the Trustee establishes his

32

prima facie case, he need not affirmatively disprove every other potential theory.

<u>In re Rowanoak Corp.</u>, 344 F.3d 126, 131-32 (1st Cir. 2003).

Here, the District Court did not clearly err in deciding that PTC satisfied its burden of proving its <u>prima facie</u> case (<u>i.e.</u>, that PTC proved all the elements of a fraudulent transfer set forth in 11 U.S.C. § 548), and thus it was incumbent on the Class Defendants to produce some evidence to rebut PTC's proof. That the Class Defendants failed to do so makes affirming the District Court the only proper course.

\* \* \* \* \*

The District Court did not err in concluding that the Third Amendment was a fraudulent transfer that PTC may avoid pursuant to 11 U.S.C. § 548. We therefore affirm its determinations in every respect.

33